## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

SLIPKNOT, INC.

           Plaintiff,

vs.

SLIPKNOT.COM; JOHN DOES 1-10, fictious individuals responsible for registering and creating Slipknot.com; and ABC CORPORATIONS 1-10, fictious entities responsible for registering and creating Slipknot.com,

           Defendants.

Civil Action No.

## COMPLAINT

Plaintiff Slipknot, Inc. (hereinafter "Plaintiff"), by and through its attorneys for their claims for relief and causes of action against Defendants Domain Name SLIPKNOT.COM, John Does 1-10, and ABC Corporations 1-10 (collectively, "Defendants"), complains, alleges, and alleges as follows:

### NATURE OF ACTION

1. This action is brought *in rem* pursuant to the federal Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(2)(A) against the *res*, Defendant domain name <slipknot.com> seeking injunctive relief, plus an *in personam* action for trademark infringement, unfair competition, and common law trademark infringement and unfair

competition against the fictitious entities John Does 1-10 and ABC Corporations 1-10 (all together, the "Defendants").

## THE PARTIES

2. Plaintiff is the world-famous heavy metal band Slipknot. It is a corporation organized under the laws of California with an address at 15260 Ventura Blvd, Sherman Oaks, California.

3. Neither the ICANN nor WHOIS Registration Records for the <slipknot.com> domain name provide the identify of the registrant. The ICANN Records list the registrant's name as "Domain Administrator" and the name of the registrant organization is "Redacted for Privacy." The WHOIS records only state "Domain Administrator" under the registrant name and do not list a registrant organization. Plaintiff is unable to identify the identity of the registrant from these records, which only disclose that registrant has a mailing address at a post office box outside of the United States at PO Box No 11463, Grand Cayman, KY1-1009.

4. John Does 1-10 and ABC Corporations 1-10 (the "Unidentified Individuals") are as-yet unidentified individuals and entities responsible for registering the <slipknot.com> domain name and creating a website directing users to third-party websites including those that sell counterfeit merchandise infringing the SLIPKNOT trademark mark owned by Plaintiff. Once these unknown individuals and entities are identified, Plaintiff expects to seek leave to amend this Complaint to name specific individuals or entities

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the *in rem* action against the <slipknot.com> domain name under 28 U.S.C. § 1331 because this case arises under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

6. 15 U.S.C. § 1125(d)(2)(A) provides for an *in rem* action against a domain name if the owner of the trademark is unable to obtain personal jurisdiction over a person who would have been a

defendant under 15 U.S.C. § 1125(d)(1). The registrant of <slipknot.com> should be a defendant under 15 U.S.C. § 1125(d)(1) because the <slipknot.com> domain name contains the identical SLIPKNOT trademark that is owned, federally registered, and continuously used by Plaintiff. Further, the <slipknot.com> domain name is being used in bad faith to profit from the goodwill of the distinctive and famous SLIPKNOT mark by generating revenue from the inclusion of links to sponsored searches and from the click-throughs of unsuspecting internet users seeking authorized content created or endorsed by Plaintiff. The <slipknot.com> domain name is also being used in bad faith by directing these users to third-party websites that sell counterfeit merchandise that also infringe Plaintiff's SLIPKNOT mark.

7.   The name of the registrant of the <slipknot.com> domain is not identified in WHOIS or ICANN records, but these records list a post office box address for registrant in the Cayman Islands. Elsewhere in these records, "technical" and "administrative" contact information is given. Here, an organization named "Slipknot Online Services, Ltd" is listed along with the same address in the Cayman Islands. A search for this organization name however shows that it is not registered in any state in the United States. Attached hereto as Exhibits A and B are the ICANN and "Who Is" Lookup data for the <slipknot.com> domain reflecting available registration information. Therefore, upon information and belief, Plaintiff is unable to obtain personal jurisdiction over the registrant of the <slipknot.com> domain name, because the registrant's identity is not available and because the address provided is outside of the United States.

8.   Therefore, this case is being brought against the *res* <slipknot.com> domain name to the extent that there is no personal jurisdiction over registrant, as well as against the Unidentified Individuals in order to obtain an order from this Court revealing their true identities.

9. The Court has jurisdiction over the *res*, the <slipknot.com> domain name, pursuant to 15 U.S.C. § 1125(d)(2)(C)(i), because Verisign Global Registry Services ("Verisign"), the registry that is the exclusive registry for all TLD ".com" domain names, including <slipknot.com>, has its world headquarters and principal place of business in Reston, Virginia, and is incorporated under the laws of Virginia.

10. The Court also has subject matter jurisdiction over the action pursuant to 15 U.S.C. § 1121, U.S.C. §§ 1331, and 1338(a), and has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they are so related and form part of the same case or controversy.

11. This Court has personal jurisdiction over the Unidentified Individuals arising from their regular and continuous conducting and transacting of business, including the acts referenced herein, in the Commonwealth of Virginia and within this judicial district, and upon the Unidentified Individuals taking actions which were intended to have an effect in this judicial district. The Unidentified Individuals also maintain certain domain infrastructure registered through VeriSign, which resides in the Eastern District of Virginia, utilize instrumentalities located in Virginia to carry out the acts alleged herein, and engage in other conduct availing themselves of the privilege of conducting business in Virginia.

12. Venue is proper in this judicial district pursuant to 15 U.S.C. § 1125(d)(2)(A) because it is the principal place of business of the <slipknot.com> domain name's registry, Verisign. Venue is also proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district, as well as under 28 U.S.C. § 1391(c) because the Defendants are subject to the Court's personal jurisdiction with respect to such action.

## PLAINTIFF AND THE SLIPKNOT MARK

13. Plaintiff's band was founded in 1995 in Des Moines, Iowa. At its inception, the band performed at local music venues and recorded its first demo under the name SLIPLKNOT in 1996 entitled "*Mate. Feed. Kill. Repeat.*"

14. By 1997, Plaintiff had established a growing fan base. The band played to a crowd of over 12,000 at "Dotfest" in Des Moines, Iowa, as well as at the Ismist Festival in Lincoln, Nebraska. By the end of 1997, the band decided every band member would wear a unique mask and matching jumpsuit with each member being referred to by a number (0-8).

15. In 1998, on the strength of the band's demos and growing popularity, SLIPKNOT signed a seven-album deal with Roadrunner Records.

16. In the spring and summer of 1999, Plaintiff performed at Ozzfest, an annual festival tour of the United States founded by Ozzy Osbourne and Sharon Osbourne. It also performed a total of 72 shows at the Livin La Vida Loco concert tour from August to November of 1999.

17. Following the band's appearances at Ozzfest, Plaintiff released its debut album titled "*Slipknot*" in June, 1999, which received a strong critical response. The band rapidly rose to national fame, performing in front of large audiences at renowned venues across the country.

18. On November 9, 1999 Plaintiff released its first video-album entitled "Welcome to Our Neighborhood." The album was soon after certified Platinum by the Recording Industry Association of America. The Canadian Recording Industry Association also certified the album as Platinum.

19. Plaintiff then embarked on its first international tour, the World Domination Tour, which it also headlined, playing across Europe, Japan, Australia, and the United States, touring from

late 1999 through 2000. Immediately after, Plaintiff embarked on its "Tattoo the Earth" tour.

20. In early 2000, the band's debut album "Slipknot" was certified Platinum, and the band released singles and music videos for its song entitled "Wait and Bleed" and "Spit It Out."

21. In January 2001, Plaintiff began recording its next studio album at Sound City in Los Angeles. By this time the group had become extremely popular and anticipation for the band's second album was high. In February, 2001, the band embarked on the "Iowa World Tour" where the band performed sold out shows in venues across the United States. In August, 2001, Plaintiff released its second album, titled "Iowa" to massive sales and extensive media coverage and critical acclaim.

22. Plaintiff began the Iowa World Tour in the spring of 2001, touring throughout the United States and Europe, followed by its "Pledge of Allegiance Tour," which concluded in November 2001.

23. Later in November 2001, Plaintiff announced another European tour, which ended in Birmingham England in February 2002. Its London show was filmed and would later be used for its "Disasterpieces" video album.

24. Throughout this time Plaintiff was continually using the SLIPKNOT mark to promote and market its live performances as well as its musical and video recordings and associated merchandise.

25. In February 2002, the movie Rollerball was released, in which Plaintiff made an appearance performing its song "I Am Hated."

26. Plaintiff toured across Japan in the spring of 2002 and then again throughout Europe.

27. Plaintiff's song "Snap" was featured in the soundtrack of the film "Freddy vs. Jason," which premiered in August 2003, with Plaintiff in attendance.

28. In 2005, Plaintiff released its third album, "Vol. 3: (The Subliminal Verses)."

29. While on the world tour to promote its third album, Plaintiff recorded a two-disc live album, which it released in late 2005 titled "9.0: Live."

30. In 2008, Plaintiff released the album "All Hope is Gone," embarking on another world tour to promote the album. "All Hope is Gone" debuted at number one on the US Billboard 100 chart, received critical acclaim, and sold more than a million copies in just the United States.

31. In 2014, Plaintiff released its fifth studio album, titled ".5: The Gray Chapter."

32. In 2015, Plaintiff performed for the first time in Mexico, which was featured in its second live album entitled "Day of the Gusano: Live in Mexico. The album was released in 2017.

33. Plaintiff released its sixth studio album "We Are Not Your Kind" in 2019 followed by its seventh studio album, "The End, So Far," in 2022.

34. In 2024, Plaintiff performed at the Knotfest in Des Moines, Iowa, a globally renowned event that Plaintiff founded.

35. On September 5, 2025, Plaintiff released a 25th Anniversary Edition Deluxe Reissue featuring its Original Studio Album plus 46 bonus tracks (42 of which were previously unreleased).

36. To date, Plaintiff has sold over 12 million records in the United States and over 30 million records worldwide.

37. Apart from using the SLIPKNOT mark in connection with its live musical performances and musical recordings, Plaintiff had also used the mark SLIPKNOT in connection with merchandise since at least as early as 1996. Examples of apparel, including shirts, t-shirts, and sweatshirts, featuring the SLIPKNOT mark are included below:





38.    Examples of the SLIPKNOT mark being used on accessories, including but not limited to hats, buttons/pins, bags, and pool floats, are included below:

.





39. Plaintiff is the owner of the United States Trademark Registration No. 2566448 for the mark SLIPKNOT (Stylized) **Slipknot**, which registered on May 7, 2002 in Class 9 for a *Series of Pre-Recorded [CD Roms], Compact Discs, DVDs, Audio Cassettes, Phonograph Albums and Videotapes Featuring Music*, claiming a first use date of October 31, 1996.

40. Plaintiff is the owner of the United States Trademark Registration No. 2566447 for the mark SLIPKNOT (Stylized) **Slipknot**, which registered on May 7, 2002 in Class 41 for *entertainment services, namely, live performances by a musical group*, claiming a first use date of April 4, 1996.

41. Plaintiff is the owner of the United States Trademark Registration No. 2568946 for the mark SLIPKNOT (Stylized) **Slipknot**, which registered on May 14, 2002 in Class 25 for *t-shirts, sweat shirts, long sleeve shirts, ski hats, baseball caps, and jackets* claiming a first use date of April 4, 1996.

42. Plaintiff is the owner of the United States Trademark Registration No. 7441672 for the mark **SLIPKNOT**, which registered on July 9, 2024 in Class 9 for *Series of musical sound recordings; downloadable music sound recordings; musical video recordings; downloadable music video recordings; audiovisual recordings featuring live musical performances; downloadable audiovisual recordings featuring live musical performances; cell phone cases*, claiming a first use date of October 31, 1996.

43. Plaintiff is the owner of United States Service Mark Registration No. 7441680 for the mark **SLIPKNOT** which registered on July 9, 2024 in Class 41 for *Entertainment, namely, live performances by a band; Entertainment, namely, live visual and audio performances by a band; Entertainment, namely, personal appearances by a band; Entertainment services, namely, providing news and information about a band via a website; Providing on-line non-downloadable photographs, musical sound recordings, music video recordings featuring music and entertainment and audio and audiovisual recordings featuring music and entertainment via a website*, claiming a first use date of April 4, 1996.

44. Plaintiff is the owner of the United States Trademark Registration No. 7441677 for the mark SLIPKNOT **Slipknot**, which registered on July 9, 2024 in Class 25 for clothing, namely, t-shirts, sweatshirts, swimsuits, hats, shorts, baseball hats, hooded sweatshirts, socks, crewneck sweatshirts, one-piece outfits for babies, long sleeve shirts, shirts, beanies, jackets, scarfs, sweatpants, pants, tank tops, claiming a first use date of April 4, 1996.

45. Plaintiff is the owner of the United States Trademark Registration No. 7441673 for the mark SLIPKNOT _Slipknot_ , which registered on July 9, 2024 in Class 18 for *tote bags*, claiming a first use date of 2000.

46. Plaintiff is the owner of the United States Trademark Registration No. 7441679 for the mark SLIPKNOT _Slipknot_ , which registered on July 9, 2024 in Class 33 for *whiskey*, claiming a first use date of July 9, 2019.

47. Plaintiff is the owner of the United States Trademark Registration No. 7788227 for the mark SLIPKNOT _Slipknot_ **,** which registered on May 6, 2025 in Class 18 for *backpacks*, claiming a first use date of 2004.

48. Plaintiff's extensive use of the SLIPKNOT mark has developed significant consumer recognition and goodwill. Beginning in 1999 and continuing through the present, the SLIPKNOT mark has come to be widely recognized by the public as identifying Plaintiff and its music-related goods and services.

49. Plaintiff's mark also became famous well before 2001.

50. Plaintiff has expended substantial time, money and resources in advertising, marketing and promoting its music and merchandise under the mark SLIPKNOT and the mark is widely recognized as a "source identifier" for Plaintiff.

## DEFENDANT'S REGISTRATION AND USE OF THE DOMAIN NAME

51. Upon information and belief, on or about February 5, 2001, the Unidentified Individuals registered the <slipknot.com> domain using Public Domain Registry as the registrar and withholding their organization name.

52. Without Plaintiff's authorization and after Plaintiff acquired protectable exclusive rights in the distinctive SLIPKNOT mark and after the SLIPKNOT mark became famous, the

Unidentified Individuals posted a live web page at slipknot.com, which remains active as of the filing of this Complaint (the "Slipknot.com Website").

53. Upon information and belief, the <slipknot.com> domain name was registered in an effort to profit off of Plaintiff's goodwill and to trick unsuspecting visitors—under the impression they are visiting a website owned, operated, or affiliated with Plaintiff—into clicking on web searches and other sponsored links.

54. The Slipknot.com Website consists of a single page with three options presented to users. The three options rotate between various offerings for goods and services each time a user arrives at the page, including those that would specifically be of interest to fans of Plaintiff, including but not limited to "Slipknot Merchandise,"  "Concert Tickets," "Concert VIP Packages," "Image Generative AI," "Domain Available," "Costumes," "Masks," and "Metallica Concert Tickets."

55. Upon first arriving at the Slipknot.com Website, users are presented with three of these options, as depicted below:



56. Upon selecting one of these options, the user is brought to a search engine search associated with the option selected and presenting one or more "sponsored" searches. For example, when "Concert Tickets" is selected, the user is directed to numerous sponsored searches.



57. Upon information and belief, the Unidentified Individuals make money from the sponsors of these searches and/or whenever visitors to the page click on a link.

58. When the "Slipknot Merchandise" option is selected, the user is similarly brought to sponsored search results, as show below:



59. When the "visit website" button is clicked, the user is then taken to another search page featuring counterfeit merchandise unlawfully bearing the SLIPKNOT mark:

.



60. The counterfeit merchandise includes t-shirts and sweatshirts, which Plaintiff also sells.

61. Plaintiff did not authorize any of the above-shown merchandise featuring its SLIPKNOT mark.

.

62. The Unidentified Individuals are therefore using the Slipknot.com Website to engage in at least the advertising, promotion, and offering for sale of counterfeit goods.

63. Examples of other iterations of the Slipknot.com Website's home pages can be seen below:





64. The <slipknot.com> domain is identical to Plaintiff's SLIPKNOT mark, which was distinctive and famous when the Unauthorized Individuals registered the <slipknot.com> domain name in 2001.

65. Upon information and belief, Unauthorized Individuals were aware of Plaintiff's rights in the SLIPKNOT mark when they selected and registered the <slipknot.com> domain name, and knowingly and intentionally registered the <slipknot.com> domain name because it contained the SLIPKNOT mark.

66. In 2001 when the Unidentified Individuals registered the <slipknot.com> domain, Plaintiff had already released extremely popular records that were certified Platinum in both the United States and Canada, toured around the world, and had already been using SLIPKNOT mark for five years in conjunction with its goods and services.

67. Upon information and belief, the Unidentified Individuals used the <slipknot.com> domain, which is identical to Plaintiff's famous and distinctive SLIPKNOT mark, to divert internet users looking for Plaintiff's website to the unauthorized Slipknot.com Website.

68. The intent of the Unidentified Individuals to capitalize off of Plaintiff's distinctive and famous mark is further demonstrated by the fact that the Slipknot.com Website provides and promotes links to websites selling goods and services that are related to Plaintiff's goods and services offered under the SLIPKNOT mark.

69. The subject matter of most of the sponsored links provided to users at the Slipknot.com Website relate to Plaintiff's goods and services in some way, including concert tickets, concert VIP packages, masks, and costumes. As a result, consumers are likely to be confused into thinking that Plaintiff authorized, approved, or is affiliated or connected with the Slipknot.com Website and the goods, services, and websites promoted on the site, when that is not the case.

70. Additionally, the Slipknot.com Website directs users to a third-party website where actual counterfeit merchandise bearing the SLIPKNOT mark can be purchased. A fan of Plaintiff or someone who otherwise wanted to purchase authorized Slipknot merchandise would undoubtedly visit the Slipknot.com Website assuming it belonged to Plaintiff and then purchase the Slipknot merchandise linked to on the site, causing damages to Plaintiff.

71. Due to the identical nature of the <slipknot.com> domain name and Plaintiff's famous and distinctive SLIPKNOT mark, consumers are likely to associate the <slipknot.com> domain with Plaintiff, impairing the distinctiveness of Plaintiff's mark and harming its reputation to the extent that counterfeit merchandise of reduced quality is sold.

72. The counterfeiting and infringing acts of the Unidentified Individuals as alleged herein have caused and are likely to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of the counterfeit goods linked to on the Slipknot.com Website and have deceived and are likely to deceive the relevant consuming public into believing, mistakenly, that the Unidentified Individuals' counterfeit goods originate from, are associated or affiliated with, or are otherwise authorized by Plaintiff.

73. Upon information and belief, the Unidentified Individuals have no rights in the SLIPKNOT mark or any other mark that is similar to the <slipknot.com> domain name.

74. Upon information and belief, the Unidentified Individuals had no legitimate purpose for registering the <slipknot.com> domain name and did so only with bad faith intent to profit from the goodwill in the SLIPKNOT mark.

75. Upon information and belief, the Unidentified Individuals are using the <slipknot.com> domain name with bad faith intent to financially benefit from click-through revenue upon persons clicking on the sponsored links displayed on the Slipknot.com webpage or otherwise from these third-party sponsors.

76. Upon information and belief, the registrant has never used the domain name in connection with a bona fide offering of goods or services. The use of a domain name to host pay-per-click advertising is not a legitimate use.

77. Further demonstrating the bad faith use of the <slipknot.com> domain name by the Unidentified Individuals is that the Slipknot.com Website links to counterfeit goods and does not link to Plaintiff's own website.

78. Upon information and belief, the Unidentified Individuals' acts alleged herein are willful, with the deliberate intent to trade on the goodwill of Plaintiff's SLIPKNOT mark, cause confusion and deception online and in the marketplace, divert internet users looking for Plaintiff's website or Plaintiff's goods and services under the SLIPKNOT mark to the Slipknot.com Website, and divert potential sales of Plaintiff's goods and services to the third-party websites from whom the Unidentified Individuals receive referral and click-through revenues.

## COUNT I

**VIOLATION OF ANTICYBERSQUATTING CONSUMER PROTECTION ACT
UNDER SECTION 43(d) OF THE LANHAM ACT, 15 U.S.C. § 1125(d)**

*In rem* **proceeding against the <slipknot.com> domain**

79. The foregoing allegations set forth herein are incorporated by reference.

80. Prior to the registration of the <slipknot.com> domain, Plaintiff was a famous heavy metal band and the owner of the SLIPKNOT mark, which it used to promote its goods and services.

81. Prior to the registration of the <slipknot.com> domain name, Plaintiff's mark was distinctive and famous.

82. The actions of the Unidentified Individuals in anonymously registering the <slipknot.com> domain constitutes registration, trafficking in, or use of a domain name that is identical to Plaintiff's SLIPKNOT mark with a bad faith intent to profit therefrom.

83. The Slipknot Website also facilitates the sale of unauthorized and counterfeit Slipknot goods by third-party websites.

84. Upon information and belief, the Unidentified Individuals do not have any trademark or other intellectual property rights in in the SLIPKNOT mark or domain name.

85. The SLIPKNOT mark does not constitute the use of the legal name of a person or that is commonly used to identify people.

86. Upon information and belief, the Unidentified Individuals have not used the <slipknot.com> domain name in connection with the bona fide offering of any goods or services.

87. Upon information and belief, the Unidentified Individuals intend to divert consumers seeking to visit Plaintiff's own website or otherwise obtain information about Plaintiff

and/or its good and services to the webpage accessible under the <slipknot.com> domain for the commercial gain of earning click-through or referral revenue.

88. Because the identity of the registrant of the Slipknot.com Website has been "redacted for privacy" and provides a PO box address in the Cayman Islands, Plaintiff is unable to obtain *in personam* jurisdiction over the Unidentified Individuals who registered and own the <slipknot.com.> domain or any other person who would have been named as a defendant in a civil action under 15 U.S.C. § 1125(d)(1). *See id.* § 1125(d)(2)(A)(ii)(I).

89. The aforesaid acts of the Unidentified Individuals have caused, and planned activities will continue to cause, irreparable injury to Plaintiff. Unless such acts are restrained by this Court, they will continue, and Plaintiff will continue to suffer such injury.

90. Plaintiff therefore seeks an order directing Public Domain Registry, as registrar of the <slipknot.com> domain, to transfer the registration of the <slipknot.com> domain to Plaintiff pursuant to 15 U.S.C. § 1125(d)(1)(C), along with monetary compensation and statutory penalties.

## COUNT II

### TRADEMARK INFRINGEMENT UNDER SECTION 32 OF THE LANHAM ACT, 15 U.S.C. § 1114

91. The foregoing allegations set forth herein are incorporated by reference.

92. The Unidentified Individuals, through the conduct described above, are, without Plaintiff's consent, using Plaintiff's SLIPKNOT mark in commerce in connection with its business of promoting and advertising third-party websites in exchange for click-through and referral revenue and promoting, advertising, and offering for sale counterfeit goods, which has and is likely to cause confusion or mistake and/or to deceive in violation 15 U.S.C. § 1114(1).

93. As a result of the Unidentified Individuals' acts of infringement, Plaintiff has suffered, and if not enjoined will continue to suffer, serious and irreparable harm. Plaintiff is therefore

entitled to injunctive relief pursuant to 15 U.S.C. § 1116 and damages pursuant to 15 U.S.C. §§ 1114 and 1117.

94. The aforesaid wrongful conduct has been willful, wanton and malicious and done with full knowledge of Plaintiff's prior use and registration of, and rights in and to, the SLIPKNOT mark and intent that such use cause confusion, mistake, or deceive consumers. Plaintiff is therefore entitled to an award of its reasonable attorney's fees and costs, and treble its actual damages, pursuant to 15 U.S.C. § 1117(a).

## COUNT III

### UNFAIR COMPETITION UNDER SECTION 43
### OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

95. The foregoing allegations set forth herein are incorporated by reference.

96. As described above, the Unidentified Individuals are using the Slipknot.com Website to engage in advertising, promotion, and offering for sale of counterfeit goods using Plaintiff's protected SLIPKNOT mark, which is likely to cause confusion or mistake and/or to deceive in violation of 15 U.S.C. § 1125(a).

97. The counterfeit products sold through the sponsored third-party links contained on the Slipknot.com Website are of the same nature and type as Plaintiff's own products and, as such, the activities of the Unidentified Individuals through the Slipknot.com Website is likely to cause confusion to the general purchasing public.

98. The Unidentified Individuals' unlawful, unauthorized and unlicensed advertisement, promotion, and offer for sale of counterfeit products creates express and implied misrepresentations that these products were created, authorized or approved by Plaintiff, which has resulted in profits to the Unidentified Individuals and damage and injury to Plaintiff.

99.  By misappropriating and using the SLIPKNOT mark, both in the <slipknot.com> domain and in the links to the counterfeit products, the Unidentified Individuals misrepresent and falsely describe to the general public the origin and source of the services and products linked to the Slipknot.com Website and create a likelihood of confusion by consumers as to the source of such goods and services.

100.  The acts of the Unidentified Individuals, which are carried out in interstate commerce, constitutes a false designation of origin and unfair competition.

101.  As a result of these acts of unfair competition, Plaintiff has suffered and will continue to suffer serious and irreparable harm for which there is no adequate remedy at law.

102.  As a result of the conduct of the Unidentified Individuals, Plaintiff is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a), 1116, and 1117.

<u>**COUNT IV**</u>

**COMMON LAW TRADEMARK
INFRINGEMENT AND UNFAIR COMPETITION**

103.  The foregoing allegations set forth herein are incorporated by reference.

104.  The acts of the Unidentified Individuals complained of herein constitute trademark infringement in violation of the common law of the State of Virginia, directly and proximately resulting in damages in an amount to be shown at trial, but not less than $75,000, exclusive of interests and costs.

105.  The acts of the Unidentified Individuals complained of herein constitute unfair competition in violation of the common law of the State of Virginia, directly and proximately resulting in damages in an amount to be shown at trial, but not less than $75,000, exclusive of interests and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants as follows:

1.     Entry of an Order pursuant to 15 U.S.C. § 1125(d)(2)(D) to transfer the registration of the <slipknot.com> domain to Plaintiff;

2.     Permanently Enjoin the Unidentified Individuals from using the names and mark SLIPKNOT or slipknot.com, or any other marks confusingly similar thereto, alone or in combination with other words, names, styles, titles, designs or marks and from otherwise competing unfairly with Plaintiff in any manner;

3.     Permanently Enjoin the Unidentified Individuals from using any trade practices whatsoever including those complained of herein, which tend to unfairly compete with or injure Plaintiff's business and goodwill pertaining thereto; and

4.     Awarding compensatory and punitive damages in favor of Plaintiff;

5.     Awarding reimbursement of attorneys' fees and costs to Plaintiff; and

6.     For such other and further relief in favor of Plaintiff and against Defendants as may be appropriate.

### **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable under Counts I-IV in this action.

Respectfully Submitted:

Dated: October 15, 2025        By: */s/ Craig C. Reilly*
                               Craig C. Reilly, Esq.
                               VSB # 20942
                               429 N. St. Asaph Street
                               Alexandria, VA 22314
                               T: (703) 549-5354
                               F: (703) 549-5355
                               E: craig.reilly@ccreillylaw.com

.

Jessica H. Zafonte
**CHIESA SHAHINIAN & GIANTOMASI PC**
**11 Times Square, 34 Floor**
**New York, NY 10036**
**212.324.7278**
**jzafonte@csglaw.com**

*Attorneys for Plaintiff*